THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* CINDY K. GROFFMAN *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 59701, 60675 cons.

Opinion filed August 30, 1976.

140

SIMON, J., dissenting.

Patrick A. Tuite, of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale, Robert Retke, and Ann Acker, Assistant Corporation Counsel, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

We have consolidated two appeals for hearing and decision. In case No. 59701, defendant Cindy K. Groffman was found guilty of two separate violations of the Municipal Code of Chicago 1973, ch. 104.1, par. 104.1—2, which makes it unlawful to operate a public place of amusement without a license. Defendant Claude Jones, Jr. was found guilty of violating the same ordinance 7 times in case No. 59701 and 44 times in Case No. 60675. The trial court imposed fines of $100 and costs of $5 against each defendant as to each charge. The primary issue raised by defendants is directed to the constitutionality of the general licensing provisions of the Municipal Code 1973, ch. 101, par. 101—5.

Two preliminary matters require attention:

First, plaintiff City of Chicago has moved to dismiss the appeal in case No. 60675 for failure of the defendants to file the record on appeal within the prescribed time. We have taken this motion for disposition with the case. Although prosecutions under city ordinances are quasi-criminal in nature, they are civil in form and the civil rules of procedure are applicable on trial and on review. (*City of Decatur v. Chasteen* (1960), 19 Ill. 2d 204, 216, 166 N.E.2d 29; *City of Highland Park v. Curtis* (1967), 83 Ill. App. 2d 218, 222, 226 N.E.2d 870.) The defendants in good faith requested and were granted extensions of time for filing of the record by the trial court under the rules applicable to criminal cases. (Compare Rule 326 with Rule 608(c). Ill. Rev. Stat. 1975, ch. 110A, pars. 326 and 608(c).) In our opinion, it would be an abuse of discretion to grant the motion to dismiss and it is accordingly denied. *People v. Aliwoli* (1975), 60 Ill. 2d 579, 328 N.E.2d 555.

Second, in case No. 59701, defendants argue that there is no evidence to support the judgments of guilty in the two cases against Cindy Groffman and in five of the seven cases regarding Claude Jones. An examination of the record, however, shows that defendants' counsel admitted that there was a plea of guilty in each of the nine cases. Also there was an admission by counsel of record for defendants that they had operated a public place of amusement without a license. There was no need, therefore, for the trial court to hear additional evidence.

We will next consider the sole remaining issue raised by defendants regarding the constitutionality of section 101—5 of the Municipal Code of Chicago. Chapter 101 of the Chicago Municipal Code pertains to "General Licensing Provisions." Chapter 104.1 deals with "Public Places of Amusement." Both of these chapters are material in determining the constitutional issue raised in the case before us. We will state the pertinent provisions thereof.

Section 104.1—2 of the public places of amusement ordinance (chapter 104.1 of the Municipal Code of Chicago) forbids the operation, for gain or profit, of a public place of amusement without a license. Section 104.1—3 requires that an application for license "shall be made in conformity with the general requirements of this Code relating to applications for licenses." Section 101—4 of the general licensing provisions (chapter 101) requires that applications shall be made "in writing to the Director of Revenue on a form provided for that purpose."

Section 101—5 provides that upon receipt of an application which requires an investigation or inspection by any department of the city and the approval thereof as to the character and fitness of the applicant or as to the proper location or condition of the premises, the Director of Revenue shall refer the matter to the proper department which shall

within ten days make "an investigation or inspection" and either approve or disapprove the issuance of the license and notify the Director of Revenue accordingly.

This section 101—5 (of the general licensing provisions) also provides:

> "Upon receiving *satisfactory proof* from the Director of Revenue that *the applicant* or each of the principal officers, if the applicant is a corporation, *is a fit and proper person* to be granted such license, and that all laws and provisions of this Code regulating the business or occupation for which such license is applied for, have been complied with, the *Mayor may authorize the issuance* of the said license by the City Clerk." (Emphasis added.)

This same section 101—5 of the general licensing provisions also requires that the mayor, if he disapproves the license application, notify the unsuccessful applicant in writing of the reasons for the disapproval. The applicant may, within 10 days after receiving such notice, request a public hearing, which shall be authorized within 10 days after said request, to be held before a hearing examiner appointed by the mayor. The public hearing shall be commenced within 10 days after it is authorized. The examiner is to report his findings to the mayor, who shall within 15 days after conclusion of the hearing, if he determines after the hearing that the application be disapproved, state the reason for such determination in a written finding and serve a copy thereof upon the applicant.

Other sections of the pertinent ordinances which are relevant to this appeal are as follows:

> "101—4. All applications for licenses of any character whatsoever, except those licenses specifically excepted, shall be made in writing to the Director of Revenue on a form provided for that purpose.
>
> Every application for a license shall contain the name of the person desiring the same and the place of business of such applicant. If the applicant is a partnership or firm, the application shall contain the names and residence addresses of each of its members; if a limited partnership, the names and residence addresses of each general partner thereof; and if a corporation, the application shall contain the names and residences of its principal officers. In addition to such statements, there shall be set forth in said application the location of the place of business, or proposed location thereof, for which the license is sought, and such other information as may be required by the Director of Revenue in conformity with the provisions of this Code prescribing the requirements of such license.

\* \* \*

101—14. No license or permit shall be issued to any person indebted to the city, unless and until such person pays to the city all indebtedness then due from such person or by authority of the city council otherwise discharges all such indebtedness in accordance with the terms and conditions fixed by the city council.

\* \* \*

104.1—3. An application for said license shall be made in conformity with the general requirements of this code relating to applications for licenses. Said application shall be signed by the owner or lessee of the property in his own proper person or in his name by his duly authorized agent.

104.1—4. Each application and all information required to be furnished in connection therewith or a copy thereof shall be referred to the commissioner of buildings, the director in charge of the bureau of fire prevention, and the superintendent of police. Each officer shall certify to the mayor whether or not the applicant is qualified to receive the license applied for and whether or not the place complies in every respect with the applicable provisions of this code relating to his department. No license shall be issued without approval by the mayor.

\* \* \*

104.1—6. Before any license is issued the applicant shall execute a written undertaking conditioned that the taxes imposed upon any amusement at the licensed premises will be paid in the manner and at the times provided in chapter 104 of this code."

The record shows that the defendants Groffman and Jones were cited for operating without a license for public place of amusement the theater premises at 606 S. Wabash Ave., in Chicago, apparently owned by Wabash Books, Inc., which is not a party to these proceedings. In case No. 59701 the citations were issued in January and February 1973. The owners of the theater applied for a license on March 13, 1973.

The report of proceedings filed by defendants commences with a hearing before the trial court on March 27, 1973. Counsel for the city told the court that the matter had previously been partially heard and then continued for the purpose of permitting "them" to apply for a license.

Upon filing of the license application at the office of the Director of Revenue, investigations were instituted by the police, building and fire prevention departments. (See section 104.1—4 above.) As a result of these investigations, Wabash Books, Inc., was denied a license. An inspector for the building department testified that on March 26, 1973, the subject premises lacked fire doors in two places, another type of fire door at the projection booth, automatic fire shutters at the booth and plasterboard on

the walls and ceiling. The inspector could not get access to the basement which also required his attention. The building department refused approval of the license application.

A lieutenant of the fire department testified that he inspected the premises on March 14, 1973. He found a defect in connection with the porthole openings of the projection block, failure to post occupancy placards concerning number of persons permitted to occupy the premises, lack of necessary plastering and a missing "elbow" from the heating unit.

A representative of the police department testified that the application for license was made by "Wabash Books, Incorporated, doing business as Wabash Entertainment Club." Both principal officers of this corporation stated their residence was "606 South Wabash." (See par. 101—4 above.) This was noted as incorrect by the police officer. These corporate officers refused a police request to be fingerprinted. This refusal was verified in open court by counsel for defendants. The police officer testified that the fingerprinting procedure was part of the routine investigation of all license applications by the police. The witness stated that the police department refused to approve the license application for these reasons. On April 24, 1973, the license application of Wabash Books, Inc., was disapproved as evidence by notice mailed to the applicant.

In defendants' brief the statement is made that the representative of the fire department told the trial court at a later hearing of the cause that "all fire violations were cleared up." This is literally correct. However, the record shows that the deputy from the building department was not in court at that time and police department approval was never obtained.

These factual elements do not in themselves lead to a solution of the problem before us. The sole issue here is constitutionality of the pertinent city ordinances which will be determined by construction of these enactments.

Two recent cases are important in considering this issue. In *City of Chicago v. Town Underground Theatre, Inc.* (1973), 9 Ill. App. 3d 930, 293 N.E.2d 367, this court considered an attempt by the city to enforce these same licensing ordinances against a theater. The trial court held that the ordinance as it then appeared, prior to amendment, did not contain sufficient standards to determine what information was needed for investigating applicants. The trial court accordingly dismissed a complaint by the city seeking injunctive relief against operation of the theater without a license. This was done after the city was given 60 days in which to gather the necessary information and to pass upon the license application but failed to do so.

The theater owner had filed a counterclaim seeking a declaratory judgment that the pertinent ordinances were unconstitutional. This court

held that the counterclaim was correctly denied by the trial court. This court stated, "We agree that the city would require Town to obtain a license to operate. Town must apply for a license and be subject to investigation by the municipal officers as required under the 1972 licensing ordinances." (9 Ill. App. 3d 930, 937.) This court pointed out the importance of the 1972 amendments to the city ordinance which "require specific information for the investigation, and also provide for notice and hearing in the event the license application is not approved." (See footnote at 9 Ill. App. 3d 930, 936.) The amendments noted by this court have been in force and effect during all times material to the record before us. No further review was sought by defendant (Town) from the Supreme Court of Illinois.

Thereafter, and while the instant cause was under advisement in this court, on June 8, 1976, the United States Court of Appeals held the ordinance now before us to be unconstitutional. (*Grandco Corp. v. Rochford* (7th Cir. 1976), 536 F. 2d 197.) The holding of this opinion is limited by the statement that "Section 101—5 of the Municipal Code is null and void on its face when applied to Festival Theatre Corporation and to the operation of its motion picture theaters." The court of appeals further stated that the language of the declaratory judgment there involved, "*is to be interpreted as invalidating only that portion of Section 101—5 which confers on the mayor impermissibly broad discretion, and not other provisions in that section which have not been challenged in these proceedings.*" 536 F.2d 197, 208.

The court of appeals further stated that, "The district court further found, and we agree, that the state appellate court's decision in *City of Chicago v. Town Underground Theatre, Inc.* (1973), 9 Ill. App. 3d 930, 293 N.E.2d 367, failed to provide a limiting construction with standards to govern the exercise of the mayor's discretion, which might have rendered the ordinance constitutionally acceptable." 536 F.2d 197, 207-08.

We will approach this problem with due consideration of the principle that decisions of Federal courts, except of course the United States Supreme Court, are not binding upon the courts of Illinois. (*People v. West* (1971), 3 Ill. App. 3d 106, 116, 278 N.E.2d 233, citing *People v. Stansberry* (1971), 47 Ill. 2d 541, 544, 268 N.E.2d 431, *cert. denied*, 404 U.S. 873, 30 L. Ed. 2d 116, 92 S. Ct. 121; *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072, *cert. denied*, 402 U.S. 983, 29 L. Ed. 2d 148, 91 S. Ct. 1658.) With all due deference to the United States Court of Appeals and to its decision, we are constrained to act within this principle and to state our own ideas and reach our own independent result.

The court of appeals, the district court decision from which the appeal was taken (unreported) and defendants' briefs in the case before us, all concentrate upon and criticize the words, "The mayor may authorize the

issuance of the license." They all take the position that this language "confers on the mayor impermissibly broad discretion." We reach a contrary result because it is and has long been the law of Illinois that the word "may" can be interpreted to be permissive or mandatory and that (*Hairgrove v. City of Jacksonville* (1937), 366 Ill. 163, 173, 8 N.E.2d 187):

> "The rule is that the word 'may' shall be construed to mean 'must' or 'shall' in those cases, only, where the public interest and rights are concerned, and where the public or third persons have a claim *de jure* that the power shall be exercised, or where it is necessary to so construe it to carry out the intention of the legislature. [Citation.]"

This is an old and established principle of Illinois law. In *Gillinwater v. Mississippi & Atlantic R.R. Co.* (1851), 13 Ill. 1, 3, the Supreme Court of Illinois held that:

> "It is laid down as a rule, that 'the word *may* means *must* or *shall*, only in cases where the public interests and rights are concerned, and when the public, or third persons have a claim *de jure*, that the power should be exercised.' *Schuyler Co. v. Mercer Co.* 4 Gilman, 20; *Malcom v. Rogers*, 5 Cowen, 188."

(See also *Brokaw v. Commissioners of Highways* (1889), 130 Ill. 482, 22 N.E. 596, and *People ex rel. Raster v. Healy* (1907), 230 Ill. 280, 82 N.E. 599.) In more modern times, in *Figures v. Swank* (1970), 138 Ill. App. 2d 211, 263 N.E.2d 599, *leave to appeal denied*, 44 Ill. 2d 586, this court held that a statute authorizing the Illinois Department of Public Aid to furnish one month's rent as a security deposit by use of the word "may" should actually be interpreted as meaning "shall" and of imposing a mandatory duty upon the Department to make the necessary security deposit. This point is also emphasized in *People ex rel. Oak Supply & Furniture Co. v. Department of Revenue* (1976), 62 Ill. 2d 210, 214, 342 N.E.2d 53, where the Supreme Court of Illinois described the word "shall" as "hardly unambiguous" and construed that word in the statutory context before the court as being merely permissive. Therefore, it appears that the mere use of the words "may" or "shall" do not in and of themselves determine whether the legislative intent is mandatory or permissive. The intent must be determined not simply and automatically from the words themselves but from all of the circumstances before the court including the presence of a public interest which is deserving of protection.

■■ We, therefore, construe the word "may" in this ordinance as actually meaning "shall." In our opinion, this ordinance is properly construed as vesting no discretion of any kind in the mayor. If he receives the necessary certifications from the three designated city officials, it is his duty then to issue the license. On the contrary, if these certifications are lacking it is his duty to reject the application. It is common knowledge

that the mayor of any large city would not personally engage in fire or building inspections or police investigation. These are the functions of expert officers. The mayor's duty in this regard is strictly ministerial. Since there is no room for discretion on the part of the mayor, the basis for the holding that the ordinance is unconstitutional no longer exists. The ordinance therefore is constitutionally acceptable.

Carrying the matter even further than required, none of the remaining language in this assailed section of the ordinance requires a contrary result. The word "proof" is further clarified by section 104.1—4 which directs each officer to "certify to" the mayor whether or not the proper qualifications exist. "It is a cardinal rule of statutory construction that the intent and meaning of a statute are to be determined from the entire statute. A statute is passed as a whole and not in parts. Each section and provision should be construed in connection with every other part or section." *Huckaba v. Cox* (1958), 14 Ill. 2d 126, 131, 150 N.E.2d 832.

■■ The word "satisfactory" can be regarded as mere surplusage which adds nothing to the ordinance. The word "proof" standing by itself provides a sufficient standard without the need of the adjective "satisfactory"; particularly when read with section 104.1—4. It is the law of Illinois that, in a situation of this kind, words which appear in a legislative enactment "may be declared mere surplusage to give effect to the legislative intent." *People v. Todd* (1975), 59 Ill. 2d 534, 543, 322 N.E.2d 447. See also *People v. Scott* (1974), 57 Ill. 2d 353, 358, 312 N.E.2d 596.

We reach the same result with reference to the phrase "fit and proper." These words also are to be considered within the context of all of the ordinance provisions before us. No legal problem concerning their meaning then exists. The word "fit" can be synonymous with "proper." It has been defined as "suitable by nature * * *." (See Webster's Third New International Dictionary 859 (1961).) The word "proper" is defined as "marked by suitability, fitness * * *." Webster's Third New International Dictionary 1817 (1961).

In the absence of persuasive reasons to the contrary, such as the presence of a statutory definition, courts will assume that words used in a statute have their ordinary and popularly understood meanings. *Banks v. Chicago Grain Trimmers Association* (1968), 390 U.S. 459, 20 L. Ed. 2d 30, 88 S. Ct. 1140, and *People v. Blair* (1972), 52 Ill. 2d 371, 373, 288 N.E.2d 443.

■■ There is one final cardinal rule of statutory construction which must necessarily be applied by us in this case. The courts examining this ordinance could construe the word "may" as permissive and therefore arrive at the result that the ordinance is unconstitutional because of the crucial importance of the protection of first amendment rights. The other alternative is that we consider the word "may" as mandatory in its

meaning so that the mayor has no discretion to exercise but has a legal duty to issue the license when he receives the necessary certifications. In this type of situation we are impelled to reach the result that this ordinance should "be construed so as to uphold its constitutionality if possible." (*Board of Education v. Ellis* (1975), 60 Ill. 2d 413, 416, 328 N.E.2d 294.) It is our duty to interpret this ordinance so as "to avoid, if possible, any construction that would raise doubts as to its validity." (*Greyhound Lines, Inc. v. City of Chicago* (1974), 24 Ill. App. 3d 718, 728, 321 N.E.2d 293, *leave to appeal denied,* 58 Ill. 2d 593.) We therefore reach the result that the ordinance before us does not violate first amendment rights as defendants contend but is a valid exercise of municipal power.

Able counsel for defendants has diligently collected and cited a number of cases mostly decided by the United States Supreme Court. In all of these cases, the court held that legislative enactments of various kinds which failed to provide definite guidelines were violative of constitutional safeguards. The construction which we have placed upon the ordinance before us removes ambiguity and vagueness and, in our opinion, differentiates this situation from those involved in the cited cases.

The judgments appealed from are accordingly affirmed.

Judgments affirmed.

O'CONNOR, J., concurs.

Mr. JUSTICE SIMON, dissenting:

The axiom on which the majority relies that words which appear in an ordinance "may be declared mere surplusage to give effect to the legislative intent" is rebutted by the equally respectable axioms that a court is not warranted in attributing to a legislative body an intent to place superfluous provisions in its enactments (*Skillet Fork River Outlet Union Drainage District v. Fogle* (1943), 382 Ill. 77, 85, 46 N.E.2d 73) and that legislative enactments should be construed so that no word is superfluous and each has a purpose. (*Mier v. Staley* (1975), 28 Ill. App. 3d 373, 379, 329 N.E.2d 1; *Tan v. Tan* (1972), 3 Ill. App. 3d 671, 674, 279 N.E.2d 486.) However, this appeal should not be resolved by the weight of the axioms but rather by the common sense interpretation of the ordinance in question.

I agree that the word "may" can be interpreted as the equivalent of "shall" so that the ordinance is not entirely permissive. I also agree that "satisfactory proof" is not substantially different from plain, old fashioned proof so that the use of the word "satisfactory" does not give the licensing authority leeway it would not have in the absence of that word.

However, I cannot accept the majority's treatment of the words "fit and

proper." Conceding that the words "fit" and "proper" can be regarded as synonymous, the ordinance must still be read as containing at least one of these words. Neither "fit" nor "proper" would, standing alone, be an adequate standard for a licensing authority. Neither word is more specific than any of the following standards, all of which were held to be too vague to satisfy first amendment requirements: "not of good character" or "not free from fraud" (*Schneider v. State* (1939), 308 U.S. 147, 158, 84 L. Ed. 155, 163, 60 S. Ct. 146); "[of] such character as to be prejudicial to the best interest of the people" (*Gelling v. Texas* (1952), 343 U.S. 960, 96 L. Ed. 1359, 72 S. Ct. 1002); or "for good reasons" (*Kunz v. New York* (1951), 340 U.S. 290, 293, 95 L. Ed. 280, 283, 71 S. Ct. 312).

The majority, however, states that the phrase "fit and proper" must be considered in the context of the other provisions of the ordinance. If the reasoning of the majority is that a "fit and proper" person within the meaning of the second paragraph of section 101—5 of the ordinance is one who has been approved by the departments or boards of the city pursuant to the provisions of the first paragraph of that section, this is not a reasonable interpretation. First, if that is what the city council meant, it could have said it. Second, that interpretation makes the ordinance more objectionable. The first paragraph contains the words, "character or fitness." To define a "fit" person as one who demonstrates "character or fitness" does not cure the problem of vagueness; it adds to it.

Perhaps what the majority means is that the words "character or fitness" and "fit" or "proper" in section 101—5 refer to the provisions of section 104.1—4 which applies specifically to applications for motion picture theatre licenses. This is the interpretation urged by the city. Section 104.1—4 provides that an application shall be referred to the building commissioner, the bureau of fire prevention and the police superintendent and that each of these departments shall certify to the mayor whether the applicant is qualified to receive the license and whether the premises comply in every respect with the applicable provisions of the code relating to his department. Several provisions of the municipal code relate to building and fire prevention; presumably it is these code provisions that the building commissioner and bureau of fire prevention would apply to the applicant. However, the city has not informed this court what provisions of the code the police superintendent would look to in deciding whether the applicant was qualified. The city does not pretend that the provisions of section 104.1—4 refer only to the qualifications stated specifically in the remainder of chapter 104.1; on the contrary, it asserts in its brief that "clearly not all criteria which give substance to this provision [section 104.1—4] can be spelled out in precise detail in each particular licensing ordinance."

The majority opinion is unsound because in at least three respects the

ordinances which relate to the granting of theatre licenses are too vague, broad and indefinite to satisfy first amendment standards. The first is the words "fit and proper person" used in the second paragraph of section 101—5. The second is the words "character or fitness of any applicant" used in the first paragraph of section 101—5. The third is the reference of the application pursuant to section 104.1—4 to the police superintendent without any provision in the code or any regulations to which the city has called attention to assist or guide the superintendent in determining whether the applicant is "qualified to receive the license." I, therefore, believe that the recent conclusion of the United States Court of Appeals for the Seventh Circuit in *Grandco Corp. v. Rochford* (7th Cir. 1976), 536 F.2d 197, that the guidelines set forth in the city ordinance were too uncertain to serve as the basis for licensing activity which is protected by the first amendment should be accepted by this court.

Even assuming that the constitutionality of the ordinance could be saved by a limiting construction, *Shuttlesworth v. City of Birmingham* (1969), 394 U.S. 147, 22 L. Ed. 2d 162, 89 S. Ct. 935, mandates the reversal of the judgments of guilt. In *Shuttlesworth*, the defendant had been convicted of leading a march in 1963 in violation of a Birmingham, Alabama, ordinance which required prior approval from the City Commission as a condition for any parade on city streets. The ordinance permitted the Commission to refuse a parade permit if its members believed "the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." The Alabama Supreme Court upheld the conviction in 1967, interpreting the ordinance as authorizing nothing more than even-handed traffic regulation.

The United States Supreme Court reversed the conviction. It noted that the Supreme Court of Alabama had "performed a remarkable job of plastic surgery upon the face of the ordinance" (394 U.S. 147, 153) and assumed that the ordinance as construed by that court in 1967 was valid. But, it stated that the marchers in 1963 could not reasonably be expected to have anticipated the 1967 construction, given the broad language of the ordinance and the history of its unconstitutional application by the Birmingham authorities.

In this case, as in *Shuttlesworth*, the defendants could not reasonably have foreseen that such terms as "character and fitness" and "fit and proper" would be interpreted as merely applying to specific health, safety or police regulations. And, while the Chicago ordinance may not have been applied as arbitrarily as the Birmingham ordinance, it is significant that in *City of Chicago v. Town Underground Theatre, Inc.* (1973), 9 Ill. App. 3d 930, 293 N.E.2d 367, this court pointed out that no procedures had been promulgated by the city to be followed in investigating and deciding whether an application for a theatre license should be granted.

The record in this case does not indicate that the Chicago Police Department has since that decision developed constitutionally permissible standards for passing on license applications.[1] Counsel for the city asserted in the circuit court in this case that "[the] Police Department likewise are not unbridled, they are charged with good police procedure and police regulations that control the various applications." But the record does not reveal what those regulations were.

The city can, in the interest of public health and safety, license theatres through a properly drawn ordinance setting forth clear and specific guidelines for the issuing authority. Because the ordinance in question lacks such standards, our decision should be the same as that in *Grandco.*

---

[1] The 1972 amendments, which became effective after *Town Theatre* was decided, provide for notice and prompt review of a denial of a license application, but this is no substitute for the type of narrow, certain and objective standards required to guide a licensing authority when "subjecting the exercise of First Amendment freedoms to the prior restraint of a license." *Shuttlesworth v. Birmingham* (1969), 394 U.S. 147, 150-151, 22 L. Ed. 2d 162, 167, 89 S. Ct. 935.